PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: BALTIMORE EMERGENCY
SERVICES II, CORPORATION,

*Debtor.*

STEVEN M. SCOTT,

*Appellant,*

v.

NATIONAL CENTURY FINANCIAL
ENTERPRISES, INCORPORATED; PAPPG
GRANTOR TRUST,

*Creditors-Appellees.*

No. 05-1104

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-04-207)

Argued: October 25, 2005

Decided: December 20, 2005

Before WILKINS, Chief Judge, and WILKINSON and
GREGORY, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge
Wilkinson wrote the opinion, in which Chief Judge Wilkins and
Judge Gregory joined.

**COUNSEL**

**ARGUED:** Mack Sperling, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Greensboro, North Carolina, for Appellant. Richard Marc Goldberg, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland, for Appellees. **ON BRIEF:** Scott Baena, Jay M. Sakalo, BILZEN, SUMBERG, BAENA, PRICE & AXELROD, L.L.P., Miami, Florida; Matthew G. Summers, MILES & STOCKBRIDGE, P.C., Baltimore, Maryland, for Appellant. Joel I. Sher, Kimberly M. Stoker, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland; David S. Cohen, MILBANK, TWEED, HADLEY & MCCLOY, L.L.P., Washington, D.C., for Appellee The PAPPG Grantor Trust.

---

**OPINION**

WILKINSON, Circuit Judge:

This case concerns the standing of creditors to file an adversary action in bankruptcy court asserting the interests of the estate. Plaintiffs, a secured creditor and a committee of unsecured creditors, sued a former insider of several debtor corporations to prevent his interfering with the debtors' Chapter 11 restructuring. The bankruptcy court held that plaintiffs had standing and subsequently entered a preliminary injunction and contempt order in their favor. On appeal, the district court affirmed the standing determination.

Plaintiffs argue that they had "derivative standing" to file this action because they had the debtors' consent. Even if the Bankruptcy Code allows such standing — a threshold question that neither the parties nor the lower courts addressed — it would be inappropriate here. Plaintiffs presented no evidence to the bankruptcy court that they actually had the debtors' consent, nor did the bankruptcy court determine that allowing the suit would be beneficial to the estate and necessary to a fair and efficient resolution of the bankruptcy proceedings. Without these procedural safeguards, there is no clear way to prevent creditors from commandeering bankruptcy proceedings to pursue their own interests to the detriment of the estate and other

creditors. We therefore reverse the district court and remand with instructions that the injunction and contempt order be vacated.

I.

Defendant Dr. Steven M. Scott was the 100% equity holder in, and the CEO, director, and/or managing member of, several companies (the "debtors") that supply management and physician services to healthcare providers. In combination, the debtor companies owned contracts involving over 2000 doctors and more than 200 hospitals and clinics, generating a total annual revenue exceeding $420 million. Among the most valuable of these contracts were those with the Broward Hospital District ("Broward"), which brought in about $40 million.

Between November 2002 and April 2003, the debtors filed a series of petitions with the U.S. Bankruptcy Court in the District of Maryland seeking Chapter 11 bankruptcy protection. *See* 11 U.S.C. § 1101 et seq. (2000). Appellee PAPPG Grantor Trust is the successor-in-interest to National Century Financial Enterprises (NCFE), the debtors' largest secured creditor, and the Official Committee of Unsecured Creditors appointed to represent the interests of the unsecured creditors (collectively "plaintiffs"). Together, plaintiffs hold claims of more than $430 million against the debtors.

The debtors' contracts with the Broward Hospital District were due to expire by their own terms on December 31, 2003. Though there had been some discussion regarding possible extensions, counsel for Broward sent a letter to the debtors on December 2, 2003, informing them that it was breaking off these negotiations. On that same day, Scott resigned. On or around December 5, 2003, Scott began his own independent negotiations with Broward to supply the services that the debtors had been providing. Six days later, Broward and Scott reached an agreement that he would do so. According to plaintiffs, Scott also began to sow dissent among physicians at Broward who worked for the debtors, presumably to recruit them for his new venture.

The plaintiff creditors became aware of Scott's activities shortly thereafter. They believed that his actions were undermining the debt-

ors' reorganization process and diverting assets of the debtors' estates. The debtors were at this time represented by Charles Goldstein, their Chief Restructuring Officer (CRO). According to an affidavit Goldstein filed several months later with the district court on appeal, plaintiffs discussed their concerns with him and received his permission to pursue potential claims against Scott.

Plaintiffs filed an adversary complaint against Scott with the bankruptcy court on December 18, 2003, seeking declaratory and injunctive relief. They asserted various state-law tort and contract claims, as well as claims under the federal Bankruptcy Code. The gravamen of the complaint was that Scott had undermined the debtors' business relationships and reduced the value of the estate. The debtors were parties to neither the complaint nor the motion for injunctive relief.

The bankruptcy court held a preliminary injunction hearing the following day. At that hearing, the bankruptcy court briefly addressed the issue of plaintiffs' standing. It found that "standing for some of the request for relief certainly is an open issue and one that would be raised going toward the merits." But it went on to note that "[a]t this very preliminary stage it seems to me we have standing by the [creditors'] committee . . . because of its concern over the reorganization." It further stated that "NCFE, as a real party in interest, was the biggest creditor in the case. Certainly it has standing in the sense that it is a party in interest in what is the outcome."

After hearing evidence concerning Scott's activities, the bankruptcy court issued a preliminary injunction prohibiting Scott for a period of one year from undertaking various activities deemed potentially harmful to the estate. On January 9, 2004, plaintiffs and the debtors filed a contempt motion, alleging that Scott had violated this injunction. Following a hearing, the bankruptcy court found that violations had occurred and issued a contempt order against Scott.

Scott appealed to the district court from both the preliminary injunction and the contempt order. He argued that plaintiffs lacked standing to request the preliminary injunction, and also challenged various procedural and substantive aspects of the bankruptcy court's determinations. The district court rejected all of Scott's arguments,

affirmed the preliminary injunction, and dismissed the appeal of the contempt order.

Scott appeals. We review the district court's judgment de novo, applying the same standards of review that it did to the judgment of the bankruptcy court. *See Logan v. JKV Real Estate Servs.* (*In re Bogdan*), 414 F.3d 507, 510 (4th Cir. 2005). In particular, we review the bankruptcy court's legal conclusions de novo. *Id.*

## II.

Because we find it dispositive of his various procedural and substantive challenges to the bankruptcy court's actions, we consider only Scott's argument that plaintiffs lacked standing to request the preliminary injunction.*

Under the doctrine of "derivative standing," some of our sister circuits allow a creditor or creditors' committee under certain narrow conditions to file an action in bankruptcy court in place of the debtor-in-possession or trustee. *See, e.g.*, *Smart World Techs., LLC v. Juno Online Servs., Inc.* (*In re Smart World Techs., LLC*), 423 F.3d 166, 176 & n.15 (2d Cir. 2005). The Bankruptcy Code does not expressly permit such parties to initiate adversary proceedings. *See, e.g.*, *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes* (*In re STN Enters.*), 779 F.2d 901, 904 (2d Cir. 1985). Derivative standing is thus an implicit exception to the "general rule" whereby the Bankruptcy Code assigns to the trustee or debtor-in-possession "the privilege of prosecuting" various actions on behalf of the estate. 7 *Collier on Bankruptcy* ¶ 1109.05[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005); *id.* at nn.3-5 (citing cases).

Our sister circuits that acknowledge the doctrine have allowed a bankruptcy court to grant derivative standing to a creditor or credi-

---

*We reject plaintiffs' contention that Scott's appeal of the injunction is moot. Despite the fact that the injunction's one-year term has expired, "the parties have a concrete interest in the outcome of the litigation." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 571 (1984). The proceedings in this case are ongoing, and PAPPG claims damages from violations of the injunction.

tors' committee in two limited circumstances. First, several circuits have recognized such standing when the trustee or debtor-in-possession unreasonably refuses to bring suit on its own. *See, e.g.*, *In re Smart World Techs.*, 423 F.3d at 176; *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 583 (3d Cir. 2003) (en banc); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd.* (*In re Gibson Group, Inc.*), 66 F.3d 1436, 1440-41 (6th Cir. 1995); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247-48 (5th Cir. 1988). Second, two circuits have permitted creditor derivative actions when the trustee or debtor-in-possession grants consent. *See In re Smart World Techs.*, 423 F.3d at 176 n.15; *Avalanche Mar., Ltd. v. Parekh* (*In re Parmetex, Inc.*), 199 F.3d 1029, 1031 (9th Cir. 1999). It is this latter type of derivative standing that is at issue in this case.

We have never decided whether creditor derivative suits are permitted in the bankruptcy courts of this circuit. *See Ford Motor Credit Co. v. Reynolds & Reynolds Co.* (*In re JKJ Chevrolet, Inc.*), 26 F.3d 481, 485 n.7 (4th Cir. 1994) (expressly withholding the question in the context of 11 U.S.C. § 506(c)); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13 n.5 (2000) (same). The question is a significant one, for limitations on standing are of paramount importance in bankruptcy proceedings. As we have recognized in an analogous Chapter 7 context, "[c]ourts consistently have noted a public policy interest in reducing the number of ancillary suits that can be brought in the bankruptcy context so as to advance the swift and efficient administration of the bankrupt's estate. This goal is achieved primarily by narrowly defining who has standing in a bankruptcy proceeding." *Richman v. First Woman's Bank* (*In re Richman*), 104 F.3d 654, 656-57 (4th Cir. 1997).

It is far from self-evident that the Bankruptcy Code permits creditor derivative standing. Strong arguments exist on both sides of the debate, as evidenced by the differing opinions offered in the Third Circuit's recent en banc consideration of the matter. *See Cybergenics*, 330 F.3d 548. The issue in *Cybergenics* was whether a creditors' committee could sue under 11 U.S.C. § 544(b) to avoid a fraudulent transfer when the debtor-in-possession had unreasonably refused to do so itself. *See Cybergenics*, 330 F.3d at 552, 555.

The majority found such derivative actions to be permissible, relying upon three provisions of the Bankruptcy Code that appeared to implicitly condone them, *see id.* at 559-67, the equitable power of bankruptcy courts, *see id.* at 567-69, bankruptcy court practice prior to the enactment of the Code, *see id.* at 569-72, and various policy considerations, *see id.* at 572-80. A four-judge dissent, however, found that the Bankruptcy Code nowhere authorizes the practice, *see id.* at 582-84 (Fuentes, J., dissenting), that equity provides no basis for expanding the class of potential plaintiffs beyond its statutory boundaries, *see id.* at 584-86, that pre-Code practice cannot supplement the statutory text, *see id.* at 586-87, and that Congress is the proper body for weighing different policy concerns, *see id.* The outcome in *Cybergenics* itself has only added further fuel to the debate. *Compare, e.g.*, Alan R. Lepene & Sean A. Gordon, *The Case for Derivative Standing in Chapter 11*, 11 Am. Bankr. Inst. L. Rev. 313 (2003) (favoring derivative standing), *with* Keith Sharfman, *Derivative Suits in Bankruptcy*, 10 Stan. J.L. Bus. & Fin. 1 (2004) (opposing derivative standing).

It would be ill-advised to decide this important and difficult issue here. Despite the fact that this is an open question in our circuit, neither party has addressed it in either their written or oral submissions. Instead, the parties, like the district court, simply presume that the doctrine exists in some form, and merely debate its proper contours. But even if we assume, purely for purposes of argument, that derivative standing is possible where a debtor-in-possession consents to a creditor's suit, it would nevertheless be inappropriate in this case.

### III.

Even those circuits that permit derivative standing do so only under strict conditions. Plaintiffs here claim that they obtained the debtors' consent to file this action. The leading case on such consent-based derivative suits, cited approvingly by both parties and the district court, specifies that they are permissible only as follows:

> A creditors' committee [or secured creditor] may acquire standing to pursue the debtor's claims if (1) the committee [or creditor] has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee [or

creditor] is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.

*In re Commodore Int'l, Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001) (internal quotation marks omitted); *see Glinka v. Murad* (*In re Housecraft Indus. USA, Inc.*), 310 F.3d 64, 72 (2d Cir. 2002) (applying *Commodore* to derivative suits by a secured creditor). "This approach permits a reasoned and practicable division of labor between the creditors' committee [and individual creditors] and the debtor in possession or trustee." *In re Commodore Int'l*, 262 F.3d at 100. Critically, however, it "also provid[es] bankruptcy courts with significant authority both to manage the litigation and check any potential for abuse by the parties." *Id.*

As our sister circuits that permit derivative standing have recognized, the bankruptcy court plays a vital gatekeeper role in determining whether derivative standing is appropriate in a given case. *See, e.g.*, *Cybergenics*, 330 F.3d at 580 (recognizing derivative standing that "bankruptcy courts can authorize"); *Fogel*, 221 F.3d at 965 (recognizing derivative standing by "obtain[ing] the permission of the bankruptcy court"); *In re Gibson Group*, 66 F.3d at 1442 (recognizing derivative standing "if the bankruptcy court determines that certain conditions exist and certain prerequisites are met").

Even if permitted under the Bankruptcy Code, derivative standing is the exception rather than the rule. If the former were to swallow the latter, creditors could usurp the central role that the trustee or debtor-in-possession plays as the representative of the estate. This state of affairs would be problematic, because the interests of a creditor or creditors' committee may not always align with those of the estate. *See, e.g.*, *Official, Unsecured Creditors' Comm. v. Stern* (*In re SPM Mfg. Corp.*), 984 F.2d 1305, 1315 (1st Cir. 1993) (noting that an unsecured creditors' committee "is a fiduciary for those whom it represents, not for the debtor or the estate generally"). Though the dealings between a debtor and its creditors "may be supportive and friendly," the fact that the interests are "necessarily different" means that the relationship "must necessarily be adversarial in a sense." *Id.* at 1316 (internal quotation marks omitted). Moreover, the interests of one creditor may not align precisely with those of another, since they are

competing with each other to recover from the limited resources of the estate. *See id.* at 1317 ("No two creditors have identical interests.").

A bankruptcy court must therefore ensure that a would-be derivative suit would not simply advance the interests of a particular plaintiff at the expense of other parties to the bankruptcy proceeding. The court's approval acts as a critical check upon creditor actions that might, for example, "prejudice the estate and rival creditors," or would "recover only enough to pay the lawyers." *Cybergenics*, 330 F.3d at 568, 575. Although the debtor-in-possession or trustee must also have approved the suit, the additional disinterested evaluation of the bankruptcy court can prevent well-intentioned oversights or situations where a debtor is for some reason predisposed to favor particular creditors. *See In re Gibson Group*, 66 F.3d at 1441 ("A debtor-in-possession often acts under the influence of conflicts of interest and may be tempted to use its discretion [to avoid preferential or fraudulent transfers] to favor certain creditors over others."). Permitting a creditor to sue in such a circumstance would undermine not only the efficiency, but also the efficacy and fairness, of the bankruptcy proceeding.

IV.

Plaintiffs here failed to satisfy any prong of the *Commodore* test. Thus, even if we were to recognize derivative standing in some cases, we would not permit it here.

First, there was no evidence at the time of the preliminary injunction that the debtors had in fact consented to the suit. The only evidence in the record of such permission appears in the affidavit of Goldstein, the CRO, which was filed several months later with the district court on appeal. Plaintiffs argue that it was sufficient for Goldstein to appear at the preliminary injunction hearing in the bankruptcy court and testify on their behalf, but they concede that his testimony did not address the issue of consent to sue.

The district court suggested that a debtor-in-possession's approval after the fact may be sufficient to confer standing. We disagree. Consent is the sine qua non in derivative suits of this type. If such suits

are to be allowed at all, the consent must occur before, not after, the action is filed.

Second, the bankruptcy court did not determine that this suit was either "in the best interest of the bankruptcy estate" or "necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." *In re Commodore Int'l*, 262 F.3d at 100 (internal quotation marks omitted). Although it made an oral ruling on the standing issue at the preliminary injunction hearing, that ruling addressed neither of these concerns. Plaintiffs contend that the bankruptcy court's decision to allow the action to proceed, particularly given its familiarity with the facts of the case after approximately a year of Chapter 11 proceedings, suffices to show that the required findings were made implicitly. But it would be pure speculation on our part to assume that the bankruptcy court took these factors into consideration. The bankruptcy court's familiarity should simply have made it easier to make the required findings on the record; it did not obviate the need to do so.

We furthermore reject plaintiffs' suggestion that it is possible to grant derivative standing retroactively in the absence of up-front approval by the bankruptcy court. *See, e.g.*, *Catwil Corp. v. Derf II* (*In re Catwil Corp.*), 175 B.R. 362, 365 (Bankr. E.D. Cal. 1994) (finding nunc pro tunc standing appropriate where extenuating circumstances exist). This would run contrary to the very purpose of imposing standing limitations: preventing bankruptcy proceedings from being sidetracked, even temporarily, by wasteful ancillary litigation. Where, as here, plaintiffs have already received equitable relief, it is certainly too late to grant them standing.

All of plaintiffs' arguments derive from the premise that the *Commodore* safeguards should add up to a loose functional requirement rather than a strict formal one. This is a premise we cannot accept. As we have observed in a related Chapter 7 context, "lax rules . . . are too likely to generate protracted litigation that ultimately serves the interest of neither the debtor's estate nor the creditors. . . . Stricter rules, on the other hand, have the salutary effects of advancing the estate's timely administration and shielding the courts from the needless multiplication of lawsuits." *In re Richman*, 104 F.3d at 657 (internal quotation marks and citations omitted). If derivative standing is permissible at all, requiring a formal determination of its propriety in

a given case is the only way to prevent the creditor from unjustly hijacking the bankruptcy proceedings. Such a determination "is not unduly burdensome," *Cybergenics*, 330 F.3d at 576, and the cost, even across a large number of cases, is small compared to the large-scale disruption that it prevents.

This case aptly demonstrates the potential consequences of a relaxed derivative standing doctrine. As we have repeatedly stated, "'[p]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'" *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 524 (4th Cir. 2003) (quoting *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)). A court greatly exceeds its power, and may effect grave harm, by granting such a remedy to a party that has not demonstrated standing to request it.

V.

Our conclusion that plaintiffs lacked standing to seek a preliminary injunction against Scott does not in any way express approval of Scott's actions. Scott oversaw the debtors' business operations, guided them into bankruptcy, and then abruptly jumped ship. As the bankruptcy court found, Scott subsequently sought to undermine the debtors by securing for himself their workforce and their most valuable contracts.

It remains to be established in further proceedings whether Scott breached any fiduciary, contractual, or statutory duty, or whether he simply acted in a legal but less-than-admirable fashion, by taking advantage of his bankrupt former charges for personal gain. Such proceedings are currently ongoing in the bankruptcy court, as PAPPG continues to litigate the merits of a now substantially amended complaint. Its standing to do so is not before us in this appeal, which addresses only the preliminary injunction and contempt order.

For reasons stated above, even if we were to recognize derivative standing for creditors, plaintiffs were not proper parties to the request for preliminary injunctive relief. We therefore reverse the district court and remand with instructions that the preliminary injunction and

the resulting contempt order be vacated.

*REVERSED AND REMANDED WITH INSTRUCTIONS*